# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF VIRGINIA
# (ALEXANDRIA DIVISION)

ABLV Bank, AS
23 Elizabetes Street
Riga, LV-1010, Latvia,

          Plaintiff,

v.

Center for Advanced Defense Studies Inc.
1100 H St NW, Suite 450
Washington, DC, USA 20005,

          Defendant.

Civ. A. No. 1:14-cv-01118-CMH-TCB

**JURY TRIAL DEMANDED**

## AMENDED COMPLAINT

Plaintiff ABLV Bank, AS ("ABLV"), for its Amended Complaint against Defendant

Center for Advanced Defense Studies Inc. ("C4ADS"), states as follows:

## NATURE OF THE ACTION

1.     This is a defamation action for damages and injunctive relief arising out of

C4ADS's publication and dissemination of knowingly false statements about ABLV in its

September 2013 publication entitled "The Odessa Network: Mapping Facilitators of Russian and

Ukrainian Arms Transfers" (attached as Exhibit A; hereinafter "Odessa Network Report" or the

"Report").

2.     ABLV is one of the largest privately owned banks in the Baltics, and the largest

locally owned bank in Latvia.  ABLV is a modern European bank that has been recognized by

international financial magazines as the best bank in Latvia.

3.     C4ADS's tortious conduct involves falsely depicting ABLV as the financial

services provider to an international weapons trafficking operation through which arms are

illicitly transferred to countries that are notorious violators of human rights and under international sanctions.

4.      C4ADS's statements about ABLV, which were released in Latvia on ABLV's 20th anniversary when hundreds of ABLV's important local and international clients and partners were in Latvia to celebrate with ABLV, were made with knowledge of falsity or with reckless disregard of the truth or falsity of such statements.  C4ADS wrote and published, and intended for republication, the statements with actual malice and a conscious disregard for the truth in order to further its own agenda and the agenda of its sponsors.

5.      C4ADS's statements were intended to, and were in fact, read by many worldwide, including current and potential business partners of ABLV, governments, and policy makers. C4ADS's broad dissemination of its defamatory statements about ABLV has caused significant economic, competitive, and reputational harm to ABLV.  ABLV has experienced the termination of various existing and prospective business deals.  Further, ABLV's current and prospective business partners have expressed reluctance to engage in business with ABLV in light of the false portrayal of ABLV's central role as the "Financial Services" arm of an alleged illicit weapons trafficking network that equips some of the world's most notorious human rights violators, such as the Assad regime in Syria.

## THE PARTIES

6.      Plaintiff ABLV is a Latvian company with its principal place of business at 23 Elizabetes Street, Riga, LV-1010, Latvia.

7.      Defendant C4ADS is a non-profit corporation organized and existing under the laws of Virginia and maintains an address at 1100 H St NW, Suite 450, Washington, D.C. 20005.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this action pursuant to 28

U.S.C. § 1332, as a result of the diversity of the parties and pursuant to the Court's supplemental

jurisdiction under 28 U.S.C. § 1367(a).  The amount in controversy is in excess of $75,000.00,

exclusive of interest and costs.

9.      This Court has personal jurisdiction over the Defendant because it is a resident of

Virginia.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1)

because Defendant resides in this district.  Likewise, venue is proper in this division pursuant to

Local Civil Rule 3 because Defendant resides in this division.

## FACTUAL ALLEGATIONS

### Plaintiff ABLV Bank, AS

11.     Founded in September 1993, Plaintiff ABLV is one of the largest independent,

privately owned banks in the Baltics, and the largest locally owned bank in Latvia.

12.     For centuries, Latvia has been an important commercial trading center linking the

East and the West.  Historically, Latvia and the other Baltic states of Estonia and Lithuania, were

geographically, culturally, and economically the most Western portions of the former USSR.

13.     During the early part of the 20th century and prior to Soviet rule, Latvia was at

the vanguard of industrialization in Russia, and was one of the most developed parts of the

Russian empire.  Later, in the mid to late 1980s, Latvia was again at the vanguard of socio-

economic change, this time as the leader in pressing for reform and independence from Soviet

rule.

14.     Since its independence from the USSR in 1991, Latvia embraced market reform

and moved toward liberal democracy and market capitalism and away from Russia and the

Soviet legacy.  Latvia joined the European Union and NATO in 2004 and the Organisation for

Economic Co-operation and Development has placed Latvia on its accession path to join as a full

member.  Moreover, Latvia has been accepted into the eurozone as of January 2014.  The recent

successful European parliamentary review of Latvia's banking sector allowed Latvia to progress

to Eurozone acceptance.

15.     Though Latvia is politically and economically aligned with the West, much of its

population speaks both Latvian and Russian.

16.     ABLV's business model reflects the nature of Latvia as an important East-West

commercial trading center and exporter of financial services, and centers around world-class

foreign customer service, investment and asset management, and international trade finance.

17.     ABLV is a member of the Association of Latvian Commercial Banks, which

protects interests of Latvian banks both in domestic and foreign markets, certifies banking

specialists, and arranges professional seminars.  ABLV takes an active part in operations of other

professional institutions, which aim at developing Latvia as a regional financial center.

18.     On August 1, 2013, Euromoney, the world's leading financial markets magazine

and one of the most influential and respectable publications in the banking and investment

sector, named ABLV the best bank in Latvia under Euromoney's Awards for Excellence 2013.

Euromoney has been singling out the outstanding institutions in finance through its Awards for

Excellence since 1992.  According to Euromoney, the awards recognize institutions and

individuals that demonstrate leadership, innovation, and momentum in the markets in which they

excel.   Euromoney recognized ABLV as one of the strongest banks in the region after an expert

commission carried out a detailed analysis of the bank's performance.  Global Finance

Magazine, another leading international financial magazine, has also named ABLV the best bank in Latvia.

19.     In the wake of a financial and banking crisis in 2008-2010, and past money laundering issues at other Latvian banks, the Latvian government and banking system substantially strengthened its anti-money laundering regulations and procedures.

20.     In a July 5, 2012 report that it made publicly available on its website, the Council of Europe's Committee of Experts on the Evaluation of Anti-Money Laundering Measures and the Financing of Terrorism ("MONEYVAL") stated that:

> "Latvia has a comprehensive legal structure and has taken significant legislative steps to remedy many of the deficiencies identified in the third evaluation round, particularly on the preventive side.  In particular, Latvia enacted a new Law on the Prevention of Laundering the Proceeds from Criminal Activity (Money Laundering) and of Terrorist Financing (AML/CFT Law) on 13 August 2008.  The last amendment to the AML law, which entered into force on the 31st of March 2011, brought the material elements of the ML offence more into line with the Palermo and Vienna Conventions.
>
> . . .
>
> The AML/CFT Law has expended the scope of persons subject to the AML/CFT Law (obligors), established enhanced customer due diligence measures, increased the number of supervisory authorities and their role in preventing money laundering and terrorism financing, and introduced a risk-based approach to customer due diligence (CDD).  . . . ."

21.     ABLV has become a leader in anti-money laundering and "know your customer" enforcement and monitoring, and has taken extraordinary steps to protect against money laundering activity.  ABLV's anti-money laundering and "know your customer" policies, procedures, and enforcement and monitoring activities have been recognized as sufficient.

22.     ABLV's practices ensure that it knows who its clients are.  ABLV limits its account managers to a maximum of 130 clients per manager, which is substantially lower than

the typical ratio.  ABLV group has twelve representative offices throughout the region where its clients are located.

23.     As of July 2014, 68 of ABLV's 606 full-time employees, or approximately 11.22%, were dedicated to anti-money laundering activities.

24.     ABLV has implemented and uses the most advanced anti-money laundering technology globally, including the Dow Jones Risk Compliance database.

25.     ABLV conducts rigorous due diligence on potential clients, employs third-party investigators, and rejects potential clients who refuse to reveal beneficial ownership and source of funds.

26.     Under ABLV's non-acceptable customer criteria, ABLV refuses to do business with any entity involved in even legal arms sales, let alone illicit weapons trading.  It is also ABLV's policy to not accept customers that process anonymous payments to their customers, manufacture or distribute pornographic materials via the internet, are "shell" banks, are involved in gambling, or cannot substantiate their declared business activities.

27.     Because of its strong anti-money laundering and "know your customer" enforcement and monitoring, ABLV has not been found to have laundered money, and has not been fined or received any other sanction for money laundering.

28.     ABLV is both a leader in Latvian banking and finance, and also in the Latvian community.  Recently, for example, ABLV and its charitable foundation have sponsored hundreds of children to summer rehabilitation and development camps, purchased and distributed digital hearing devices for dozens of hearing-impaired children, and established a collection for the Latvian Contemporary Art Museum.

**Defendant C4ADS**

29.      C4ADS states in the Odessa Network Report that its mission is "to understand global conflict and security through on-the-ground research and data-driven analysis. We seek to alleviate the analytical burden carried by public sector institutions by providing manpower, depth, and rigor."

30.      C4ADS further states in the Report that its "approach to understanding the drivers and enablers of global conflict leverages nontraditional investigative techniques and emerging analytical technologies." C4ADS further states in the Report that it "recognize[s] the value of working on the ground in the field, capturing local knowledge, and collecting original data to inform our analysis. At the same time, we employ cutting-edge technology to manage and analyze that data. The result is an innovative analytical approach to conflict prevention and mitigation."

31.      With respect to the area of arms trafficking and transfers, C4ADS states on its website that "[o]pen source research, data-driven analysis, and nontraditional investigative techniques can help identify enablers of conflict and instability across international boundaries and jurisdictions. We understand what data is available, where to find it publicly, commercially, and in the field, and how it can best be utilized."

32.      Although C4ADS boasts that its analytical team members have developed their capabilities through experience living and working in their countries of interest, Latvia is not among the eighteen countries C4ADS identifies as where it has "Overseas Experience."

33.      During the relevant time period, C4ADS did, however, have a relationship with a network of activists and purported investigative journalists in Latvia and the broader Baltic region. This network includes Ilze Nagla, the host of a television news program in Latvia.

34.     Nagla has been linked to the unauthorized download of confidential tax documents from the State Revenue Service in Latvia.  Using the alias "Neo," Ilmars Poikans, a researcher at the University of Latvia, downloaded the documents and leaked salary information for government officials to Nagla, who broadcast the information on her television program.

35.     Latvian authorities subsequently seized Nagla's laptop and other digital media in connection with their investigation into the data leak, and arrested Poikans.  Poikans was later charged with illegally obtaining and publishing private data.  The Latvian activist and investigative journalist community championed Poikans's cause, and aggressively targeted ABLV, believing that ABLV was behind the legal action taken against Poikans.

### The False and Defamatory Odessa Network Report

36.     On or about September 8, 2013, C4ADS published a report entitled "The Odessa Network: Mapping Facilitators of Russian and Ukrainian Arms Transfers."

37.     The named authors of the Odessa Network Report are Tom Wallace, a Senior Analyst at C4ADS, and Farley Mesko, the Chief Operating Officer of C4ADS.  Wallace is no longer with C4ADS as of June 2014.

38.     In an acknowledgment C4ADS states: "We would like to thank Palantir for its generous support; this project would not have been possible without it."  Later in the Report, C4ADS says that it relied on Palantir's Gotham technology.  Palantir, or Palantir Technologies, Inc., is an American computer software and services company, specializing in US government customers and financial customers.  Its valuation has been estimated to be in the range of $5 to $8 billion.

39.     In its introduction to the Odessa Network Report, C4ADS states that its "[R]eport is the culmination of a 10-month investigation into Ukrainian and Russian state arms transfers"

and that its "findings" include "specific companies and individuals facilitating these arms transfers."

40.     Portions of the Odessa Network Report were discussed in an article entitled "Ukrainian port eyed as analysts seek Syria's arms source" published in the Washington Post on September 7, 2013.  The Latvian activist and investigative journalism community, which has targeted ABLV in connection with legal action against Poikans, has relationships with the Washington Post, including through Inga Springe, the founder and director of the Baltic Centre for Investigative Journalism.

41.     On September 8, 2013, C4ADS sent a Twitter message referring and linking to the Washington Post article, and also linking to an online copy of the Odessa Network Report.

42.     Others having connections to the Latvian activist and investigative journalism community promoted the Odessa Network Report by publicly commenting on the Report and sending links to the Report.

43.     In the Odessa Network Report, C4ADS uses the term "Odessa Network" as its label for an international weapons trafficking network, responsible for transporting weapons "to the Assad regime in Syria, among other notorious violators of human rights."

44.     C4ADS states in the Report that the Odessa Network is "transporting billions of dollars of weapons to embargoed conflict zones and US strategic competitors."  C4ADS further states that some of the "best customers are states with poor human rights records or active sanctions:  Venezuela, Sudan, etc.," and that the weapons provided through the Odessa Network have "kept the Assad regime armed and viable through two years of brutal civil war.  Russian anti-ship and anti-air missiles shield Assad from international intervention;  Russian bullets and bombs kill Free Syrian Army members, jihadis, and civilians alike."

45.     C4ADS explains that the Odessa Network comprises "clusters of individuals and firms geographically concentrated in a particular area, and performing a specific sub-task of the weapons-export process."  C4ADS states that the Odessa Network's "six main clusters," which C4ADS says "are both intra- and inter-linked" include:

(1) "Government Agencies" in "Moscow and Kiev," responsible for "Ownership of Weapons";

(2) "Shipping companies" in "Odessa, Ukraine," responsible for "A-Z Integration";

(3) "Shipping companies" in the "EU and Russia," responsible for "Specialized Shipping Services";

(4) "Port and Port Authority" in "Ottyabrsk, Ukraine," responsible for "Loading of Weapons onto Ships;

(5) "Private Security Companies" in "Africa and the Middle East," responsible for "Protection of Sensitive Cargo"; and

(6) "Banks" in "Latvia," responsible for "Financial Services."

46.     C4ADS describes the "Financial Services," provided by the Latvian banks as "launder[ing] profits from weapons shipments," "concealing illicit arms transfers," and to achieve the "corrupt" and "illicit redistribution of national wealth to regime stakeholders" in Russia.

47.     C4ADS identifies just two Latvian banks, ABLV and Regional Investment Bank JSG, as part of the "Banks" cluster providing the "Financial Services" for the Odessa Network arms trafficking operation.

48.     C4ADS explains that in "**Chapters 4-10**," it "identif[ies] key individuals companies, and locations" that make up the Odessa Network.  It further states that "there is a persistent, predictable network by which Moscow and Kiev export weapons; a certain group of people own the ships, a certain group of people handle the money, and so on."

49.     Chapter 9 of the Odessa Network Report is entitled "Latvia: Financial Services & Laundering" and focuses on the "Banks" cluster that provides the "Financial Services" for the Odessa Network arms trafficking operation.  In Chapter 9, C4ADS states that "some of [the Odessa Network] companies employ Latvian banks known or accused of money laundering."

50.     C4ADS further states in Chapter 9 that "The Odessa Network operates in a region of the world where financial crime is endemic, large scale, and persistent" and that "[i]t is important to understand that Russian and Ukrainian arms exports occur in this context of massive and systemic financial evasion."

51.     C4ADS explains in Chapter 9 that such "money laundering is useful in arms shipping, particularly in concealing illicit arms transfers."  This is because some of the weapons exports "are or were in violation of international sanctions (Sudan, Myanmar, Syria, etc.)."  Thus, C4ADS states, "[t]he shipping companies and officials involved in such transfers would be wise to conceal their involvement for fear of public identification or legal retribution."

52.     C4ADS further explains in Chapter 9 that "[s]ince the 'money trail' is one of the most powerful and widely used ways to connect criminals to crimes, obscuring illicitly obtained finances via off-shore shell companies, proxy directors, and the like is a useful strategy for evasion."

53.     C4ADS further explains that "illicit redistribution of national wealth to regime stakeholders is how United Russia and the Party of Regions maintain stability, by making

collaboration with the state more profitable than challenging it.  By definition, money laundering is essential for such corrupt redistribution.  It is the mechanism by which favored officials can steal tax revenue, well-connected generals can sell military property to the highest bidder, and trusted oligarchs can receive sweetheart deals on state assets."

54.    C4ADS states that "[t]he US Treasury blacklisted two Latvian banks in 2005 under the Patriot Act for the role their money laundering services played in terrorist financing."

55.    C4ADS then discusses two Latvian banks, first and most prominently, ABLV. C4ADS devotes a full page of Chapter 9 to ABLV.  It then discusses another bank in a single, six-line paragraph.

56.    Specifically, C4ADS falsely states in Chapter 9 that ABLV is "a known money launderer and closely connected to the Odessa Network."

57.    C4ADS also falsely states that there is a "financial relationship between ABLV and some Odessa Network shipping firms, and a personal relationship between senior ABLV personnel and some Odessa Network leaders."  C4ADS further falsely states that "some of the [Odessa Network] companies use ABLV bank."

58.    C4ADS's statements about ABLV are false assertions of fact and defamatory. C4ADS's statements were understood by those who read them as identifying ABLV as a known money launderer; a closely connected facilitator of an illicit weapons trafficking networking arming the most notorious human rights violators; and directly involved and complicit in concealing illicit arms transfers and assisting criminals in obscuring illicitly obtained finances.

59.    Indeed, published media reports describing the Report state that C4ADS claims ABLV has "a considerable role in servicing Russian and Ukrainian arms deals and money laundering."  Another media report concerning the Odessa Network Report and entitled "Illegal

Arms Dealers From Russia And Ukraine Launder Money In Latvian Bank ABLV, Says Report," noted that C4ADS had "proof that the Odessa Network, which includes Ukraine-based individuals and logistics companies responsible for transporting weapons out of Russia and Ukraine on behalf of government sellers, use Latvian banks, known or accused of money laundering" and claimed that ABLV was "a known money launderer, and closely connected to the Odessa Network."

60.    ABLV has not been found to have participated in any money laundering.  Nor has ABLV been fined or otherwise sanctioned for money laundering.

61.    ABLV has engaged in no criminal or illicit conduct, and has not been complicit in or facilitated any criminal or illicit conduct.

62.    ABLV has no relationship with any of the "Odessa Network" companies or individuals involved in arms trading to which C4ADS refers in the Report.

63.    Indeed, ABLV does not do business with any entity involved even in the legal arms trade, let alone illicit arms trafficking.

64.    The Latvian Financial and Capital Market Commission ("FCMC") conducts regular inspections of Latvian banks to evaluate whether the banks comply with the provisions of the Law on the Prevention of Laundering the Proceeds from Criminal Activity (Money Laundering) and of Terrorist Financing and to verify the quality and effectiveness of the banks' internal anti-money laundering control systems.  The FCMC conducts additional, off-schedule inspections when a bank is alleged to be involved in money laundering activity.   After an investigation triggered by the allegations in the Odessa Network Report, the FCMC confirmed that ABLV has not breached any regulatory requirements and that there is no evidence of any

involvement by ABLV in facilitating or financing arms deals as stated by C4ADS in the Odessa Network Report.

65.     C4ADS knew its statements about ABLV were false or acted with reckless disregard for the truth or falsity of the statements.

66.     It is clear from its Odessa Network Report that C4ADS developed a pre-existing story line that Latvian banks were the "Financial Services" facilitators of Russian and Ukrainian arms trafficking; targeted ABLV, including because it is the largest locally owned bank in Latvia and in exchange for support from the Latvian activist and investigative journalism community; and recklessly disregarded evidence disproving its false claims about ABLV.

67.     For example, despite asserting that the U.S. Treasury blacklisted two Latvian banks in 2005 under the Patriot Act for the role their money laundering services played in terrorist financing, and then discussing ABLV and one other Latvian bank, C4ADS knows that ABLV has not been blacklisted by the U.S. Treasury Department.

68.     C4ADS purports to rely on a 2012 Global Witness report, but knew that the Global Witness report does not accuse ABLV of money laundering and that ABLV had confirmed that there was nothing illegal about ABLV's activity concerning the financial transfers mentioned in the Global Witness report.

69.     C4ADS also purports to rely on an alleged connection between ABLV and the Magnitsky case, but it was widely publicized that only one Latvian bank was sanctioned in connection with the Magnitsky case and that ABLV had confirmed it had not been so sanctioned.

70.     In addition, C4ADS knew that Latvia substantially strengthened its anti-money laundering laws and banking practices to prevent money laundering after a national banking and

financial crisis from 2008-2010, and that the Latvian laws are consistent with European Union regulations.

71.     C4ADS also published its false statements about ABLV without making any attempt to discuss its claims with ABLV.

72.     At a September 25, 2013 presentation at the New America Foundation in Washington, D.C., C4ADS publicly acknowledged that it intentionally applied a different and lower standard to ABLV and other non-U.S. entities than it did to American companies when preparing the Odessa Network Report due to concerns about litigation.

**Harm to ABLV Bank**

73.     C4ADS widely disseminated its Odessa Network Report and the false statements about ABLV contained therein via the internet and through the media and other organizations.

74.     Thus, the false statements have been published and republished hundreds of times in the Baltics and worldwide in many different languages, including Latvian, Russian, and Ukrainian, harming ABLV's reputation everywhere it does business.

75.     The release of the Odessa Network Report in the Latvian media was coordinated to be in the early morning on the date of ABLV's 20th anniversary, when more than five hundred important local and international clients and partners were in Latvia to celebrate with ABLV, and was covered as headline news in Latvia throughout the day.

76.     Because of C4ADS's false statements about ABLV in the Odessa Network Report, ABLV has suffered devastating reputational harm as well as pecuniary losses, including lost business relationships and opportunities.

77.     For example, a large Swedish bank with whom ABLV had a long-time correspondent bank relationship terminated that relationship because of the false allegations in the Odessa Network Report.

78.     The widespread circulation and publicizing of the Report has also frustrated and continues to frustrate potential new business opportunities for ABLV in the United States and throughout the world as many business introducers and correspondent banking partners were misled by the false accusations contained therein.  In particular, publication of the Report in New York has frustrated ABLV's attempts to establish correspondent banking relationships with several financial institutions in New York, and has also interfered with ABLV's attempts to open a branch office in New York.

79.     Reputation is crucial in the banking industry internationally.  ABLV has fiercely and successfully protected itself against money laundering, but has nonetheless suffered substantial harm to its reputation by C4ADS's false, reckless, and defamatory claims in the Odessa Network Report.

80.      The damages and reputational harm suffered by ABLV is an intended and direct and proximate result of C4ADS's defamatory statements in the Odessa Network Report.  Indeed, C4ADS states that "we believe that illicit networks are most vulnerable to disruption in exactly the places where they interact with the licit system.  Nominally licit businesses and individuals are far more susceptible to the reputational and financial penalties of exposure than the direct perpetrators of conflict and atrocities."

**C4ADS Refuses to Apologize or Retract the Statements**

81.     After the publication of C4ADS's false and defamatory statements in the Odessa Network Report, ABLV demanded retractions and apologies.  C4ADS has refused.

82.     The sole action C4ADS took was to change the word "known" to "alleged" in one sentence of the Odessa Network Report.  But that one change does nothing to cure the defamation or remedy the harm to ABLV.  Nor is there anything in the new version of the Odessa Network Report noting that C4ADS had even made a change.  C4ADS made no public announcement of the change, and the original copy of the Odessa Network Report continues to be widely available worldwide on the internet and in print.

### COUNT I
### LIBEL

83.     ABLV realleges and incorporates by reference paragraphs 1 through 82 as if restated in full.

84.     On or about September 8, 2013, C4ADS published its Odessa Network Report online via its website and in print.

85.     Within its Odessa Network Report, C4ADS falsely states that ABLV is a "known money launderer" and a "facilitator" of weapons sales and shipments out of Russian and Ukraine "to the Assad regime in Syria, among other notorious violators of human rights."

86.     The statements contained in the online and print versions of the Odessa Network Reports of and concerning ABLV are false, untrue, and defamatory, and the Report is libelous on its face because C4ADS explicitly claims that ABLV is a known money launderer that is closely connected to and facilitates an illicit weapons trafficking network responsible for arming notorious human rights violators; implies that ABLV is directly involved and actively complicit in concealing illicit arms transfers and assisting criminals in obscuring illicitly obtained finances; and associates ABLV with criminals and human rights violators.

87.     C4ADS published and circulated these false and defamatory assertions without privilege both online and in print to a wide audience.

88.     C4ADS printed, published, and circulated, or caused to be written, printed, published, and circulated, the libelous statements concerning ABLV with knowledge of the falsity of the statements or with reckless disregard for their truth or falsity.

89.     The statements in the Report were so understood by those who read them to have the defamatory meaning ascribed to them in this Complaint, and C4ADS intended the Report to be so understood and read by C4ADS's members, visitors to C4ADS's website, and everyone else who read the Report in English and subsequently in translated articles, including those individuals who received the Report from third parties who had been encouraged by C4ADS to distribute the Report in Russian, Latvian and Ukrainian languages.

90.     As a legal result of the Report and the false statements, ABLV has suffered general damages in the form of loss of reputation in an amount to be determined at trial.

91.     As a legal result of C4ADS's knowing malicious conduct, ABLV has suffered pecuniary harm in the form of lost business relationships and opportunities in an amount to be determined at trial.

92.     By engaging in the misconduct alleged above, C4ADS engaged in unjust and deceitful conduct with the willful and conscious disregard for ABLV's rights.  C4ADS was aware of the probable dangerous consequences of its misconduct and willfully and deliberately failed to avoid those consequences, including subjecting ABLV to cruel and unjust hardship, in conscious disregard of ABLV's rights.  Thus, an award of exemplary and punitive damages is justified.

**<u>DEMAND FOR JURY</u>**

ABLV demands a jury for all counts.

## **PRAYER FOR RELIEF**

WHEREFORE, ABLV respectfully requests that this Court enter judgment in favor of ABLV and against Defendant as follows:

(a)     awarding ABLV its actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

(b)     awarding ABLV punitive damages, in an amount to be determined at trial;

(c)     permanently enjoining C4ADS from engaging in the illegal activities described herein and providing restitutionary relief;

(d)     awarding ABLV its attorneys' fees and costs associated with this action to the highest extent permitted by law;

(e)     awarding ABLV prejudgment and postjudgment interest at the highest legal rate to the extent provided by law; and

(f)     granting such further relief as may be just and proper.

Dated:  January 9, 2014

_____/s/_____
Lora A. Brzezynski
Virginia Bar No. 36151
John W. Lomas, Jr.
Virginia Bar. No. 73148
Attorneys for Plaintiff ABLV Bank, AS
McKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, D.C. 20006
Phone: (202) 496-7500
Fax: (202) (202) 496-7756
lbrzezynski@mckennalong.com
jlomas@mckennalong.com

Of Counsel:

William T. O'Brien
McKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, D.C. 20006
(202) 496-7500

Karen A. Tramontano
888 17th Street,
NW Suite 800,
Washington, DC 20006
(202) 833-1281

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of January, 2015, I will cause the foregoing to be sent by U.S. mail to the following non-filing users:

Benjamin Chew, Esq.
Nigel Wilkinson, Esq.
Manatt, Phelps & Phillips, LLP
One Metro Center
700 12th Street, NW, Suite 1100
Washington D.C.  20005

/s/
Lora A. Brzezynski, Esq.
Virginia Bar No. 36151
Attorney for ABLV Bank, AS
McKenna Long & Aldridge LLP
1900 K Street NW
Washington, DC 20006
Phone: (202) 496-7500
Fax: (202) 496-7756
lbrzezynski@mckennalong.com